**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

UNITED STATES OF AMERICA,

     Plaintiff,

     -against-

AIDA RAMIREZ-ARRELLANO,

     Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

No. 17-cr-80-FPG-HKS

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT RAMIREZ'S MOTION TO DISMISS THE INDICTMENT

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Phone:  212.351.4000
Fax:  212.351.4035

*Attorneys for Aida Ramirez-Arellano*

September 15, 2017

# **TABLE OF CONTENTS**

Page

ISSUE PRESENTED ...................................................................................................1

INTRODUCTION ......................................................................................................1

STATEMENT OF FACTS ..........................................................................................3

LEGAL STANDARD ..................................................................................................9

ARGUMENT .............................................................................................................11

    I.    By statute, Ms. Ramirez was prohibited from seeking administrative or
          judicial review, satisfying §§ 1326(d)(1) and (d)(2). ........................................... 11

    II.    The July 2014 removal order was fundamentally unfair because there is a
          reasonable probability that numerous due process violations caused
          Ms. Ramirez to be removed rather than be permitted to withdraw her
          application for admission, satisfying § 1326(d)(3). ............................................... 13

          A.    The Constitution guaranteed Ms. Ramirez due process protections
                including notice, a meaningful opportunity to be heard, and an
                impartial and disinterested adjudicator. ................................................... 13

          B.    The Constitution and federal law mandated the specific procedure
                that Ms. Ramirez should have received. ................................................... 13

          C.    The government agents failed to provide the due process to which
                Ms. Ramirez was entitled.......................................................................... 14

          D.    The government agents' failures prejudiced Ms. Ramirez because,
                absent these fundamental procedural errors, there is a reasonable
                probability that she would have sought and received withdrawal of
                her application for admission.................................................................... 22

CONCLUSION .........................................................................................................28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ali v. Mukasey,*
    529 F.3d 478 (2d Cir. 2008) .......................................................................13, 21, 22

*Augustin v. Sava,*
    735 F.2d 32 (2d Cir. 1984) ...................................................................................18

*Dugdale v. U.S. Customs and Border Prot.,*
    88 F. Supp. 3d 1 (D.D.C. 2015) ...........................................................................21

*Matter of Exame,*
    18 I&N Dec. 303 (BIA 1982) ................................................................................21

*Flores v. Lynch,*
    828 F.3d 898 (9th Cir. 2016) ..................................................................................4

*Pierre v. Holder,*
    588 F.3d 767 (2d Cir. 2009) .....................................................................13, 18, 22

*Shaughnessy v. United States ex rel. Mezei,*
    345 U.S. 206 (1953)..............................................................................................13

*Shunaula v. Holder,*
    732 F.3d 143 (2d Cir. 2015) .................................................................................10

*Strickland v. Washington,*
    466 U.S. 668 (1984).............................................................................................11

*Ti Wu Gao v. Gonzales,*
    200 F. App'x 31 (2d Cir. 2006) ...........................................................................21

*United States v. Arteaga-Gonzalez,*
    No. 12-CR-4704-L, 2013 WL 5462285 (S.D. Cal. Sept. 30, 2013) ............16, 21, 22

*United States v. Barajas-Alvarado,*
    655 F.3d 1077 (9th Cir. 2011) ........................................................................10, 12

*United States v. Clinton,*
    653 F. Supp. 2d 446 (S.D.N.Y. 2009) .................................................................15

*United States v. Copeland,*
    369 F. Supp. 2d 275 (E.D.N.Y. 2005) .................................................................11

*United States v. Copeland*,
   376 F.3d 61 (2d Cir. 2004) ........................................................................... *passim*

*United States v. Garcia*,
   No. 08-cr-32, 2008 WL 3890167 (E.D.N.Y. Aug. 19, 2008) ....................................................15

*United States v. Garcia-Villa*,
   No. 14CR1481WQH, 2014 WL 4955703 (S.D. Cal. Sept. 30, 2014) ....................................23

*United States v. Gill*,
   748 F.3d 491 (2d Cir. 2014) ........................................................................................................9

*United States v. Gonzalez*,
   No. 15-CR-0021, 2015 WL 3443942 (S.D.N.Y. May 29, 2015) ....................................15, 17

*United States v. Grande*,
   623 F. App'x 858 (9th Cir. 2015) ......................................................................................26, 27

*United States v. Mejia-Avila*,
   No. 2:14-CR-0177-WFN-1, 2016 WL 1423845 (E.D. Wash. Apr. 5, 2016) ....................16, 26

*United States v. Mendoza-Lopez*,
   481 U.S. 828 (1987) .................................................................................................................9, 10

*United States v. Miranda-Rivera*,
   206 F. Supp. 3d 1066 (D. Md. 2016) ......................................................................................17

*United States v. Mosquera*,
   816 F. Supp. 168 (E.D.N.Y. 1993) ..........................................................................................15

*United States v. Raya-Vaca*,
   771 F.3d 1195 (9th Cir. 2014) ................................................................................... *passim*

*United States v. Rosales-Aguilar*,
   No. 13cr3254 BTM, 2014 WL 905913 (S.D. Cal. Mar. 7, 2014) ...........................................23

*United States v. Ruiz*,
   No. CR 14-00466 MMM, 2015 WL 13573882 (C.D. Cal. July 2, 2015)...........................20, 25

*United States v. Scott*,
   394 F.3d 111 (2d Cir. 2005) ..............................................................................................10, 11

*United States v. Sosa*,
   387 F.3d 131 (2d Cir. 2004) ......................................................................................................14

**Statutes**

8 U.S.C. § 1103 ..............................................................................................................................14

8 U.S.C. § 1225 ........................................................................................... *passim*

8 U.S.C. § 1252 ...................................................................................... 10, 12

8 U.S.C. § 1326 ........................................................................................... *passim*

**Regulations**

8 C.F.R. § 235.3 ........................................................................................ *passim*

8 C.F.R. § 1235.4 ..................................................................................... 17, 22

**Other Authorities**

INS Inspector's Field Manual (2007) ........................................................ 23

Julia Preston, *Hoping for Asylum, Migrants Strain U.S. Border*, N.Y. Times, Apr. 10, 2014 .................................................................................................... 4

Leon Rappoport, *Punchlines: The Case for Racial, Ethnic, and Gender Humor* (2005) ......................................................................................................... 5

Liz Robbins, *Owner Was Target, but Restaurant Workers Are Swept Up in Immigration Raids*, N.Y. Times, Nov. 11, 2016 ...................................... 8

U.S. Comm'n on Int'l Religious Freedom, Report on Asylum Seekers in Expedited Removal (Feb. 8, 2005) .......................................................... 6

William La Jeunesse, *Budget cuts, DC debate have illegals surging across Mexican border, experts say*, Fox News (Apr. 2, 2013) ............................ 4

Defendant Aida Ramirez-Arellano[1] respectfully submits this memorandum of law in support of her motion to dismiss the indictment under 8 U.S.C. § 1326(d).

## ISSUE PRESENTED

In July 2014, Ms. Ramirez entered the United States at its southern border and was apprehended, processed for expedited removal, and returned to Mexico. The border patrol agents conducting the expedited removal denied her the due process required by the Constitution and relevant federal regulations, causing her to be removed instead of being allowed to voluntarily return to Mexico. Can the government now rely upon this fundamentally unfair removal in charging Ms. Ramirez with felony illegal reentry?

## INTRODUCTION

Government agents at the U.S.–Mexico border must secure a vast frontier, and it is no doubt challenging to balance the competing demands of national security and constitutional guarantees. But no matter the difficulty of that challenge, the government cannot deprive any person—even one who does not have permission to enter the country—of the due process of law to which she is entitled. The Constitution does not permit shortcuts or half-measures because its guarantees are precisely that: guarantees.

At the core of due process is the right to notice of charges and a meaningful opportunity to respond. This right is not precatory, nor is it a matter of mere form. The failure to ensure that an alien detained near the border understands the charge against her, has the opportunity to respond to it, and fully comprehends its potential consequences is the difference between a lawful removal and a fundamentally unfair one.

---

[1] Ms. Ramirez's maternal surname is misspelled in the charging documents and case caption. The correct spelling is "Arellano," not "Arrellano." Declaration of Aida Ramirez-Arellano ("Ramirez Decl.") 1, n.1; *see, e.g.*, Declaration of Daniel Harris ("Harris Decl."), Ex. A.

A failure to respect these constitutionally mandated requirements is all the more damaging where the government later seeks to convict and incarcerate the person whom it deprived of due process.  Here, the government has charged Ms. Ramirez, who is the mother of two young U.S.-citizen children and who has no criminal record, with illegal reentry.  This indictment, brought under 8 U.S.C. § 1326(a), relies on Ms. Ramirez's July 2014 expedited removal.

But in recognition of constitutional guarantees, 8 U.S.C. § 1326(d) prevents reliance by illegal reentry prosecutions on removal proceedings that are "fundamentally unfair" and that do not offer the opportunity for administrative or judicial review.  By design, expedited removal proceedings preclude any review, judicial or otherwise.  And Ms. Ramirez's recollection of the proceedings, confirmed by the evidence, proves the remaining element of § 1326(d): fundamental unfairness.

Ms. Ramirez was not informed of the charge against her.  Her statements during the proceeding were transcribed unfaithfully or not at all.  And the documents upon which her removal was based, and which set out its consequences, were never translated for her.  She was ordered to sign those documents despite not understanding what they meant.  In sum, Ms. Ramirez was ordered deported based on incomplete, incomprehensible documents that did not provide notice of the charges against her, by a process where the government denied her the opportunity to be heard.

These due process violations prejudiced her.  Had the proceedings been conducted lawfully, there is a reasonable probability that Ms. Ramirez would not have been removed.  Given her circumstances and the relevant standards, it was reasonably probable that she instead would have sought and received withdrawal of her application for admission, precluding the order of removal that underpins the indictment.

The government cannot violate Ms. Ramirez's due process rights and then seek to convict her of a felony on the back of those violations. Her July 2014 removal was fundamentally unfair within the meaning of § 1326(d), requiring dismissal of the indictment.

## STATEMENT OF FACTS

Ms. Ramirez has lived in the United States for more than three years. She currently resides in Kenmore, New York, a suburb of Buffalo, with her two minor daughters, A.S. and M.S., for whom she is the sole caretaker. Ramirez Decl. ¶¶ 3, 8. A.S. was born in 2011, and M.S. was born in 2014. *Id.* ¶ 4. Both are United States citizens. *Id.*

Ms. Ramirez was born in 1992 in Toluca, Mexico. *Id.* ¶ 1. In March 2011, she crossed into the United States from Mexico and was apprehended by Border Patrol agents. *Id.* ¶¶ 14–15. The agents verified her identity and interrogated her briefly, but they did not institute removal proceedings against her. *Id.* ¶ 16. Instead, they allowed Ms. Ramirez to withdraw her application for admission and voluntarily return to Mexico without the entry of an order of removal. *Id.* ¶¶ 16–19; *see also* Harris Decl., Ex. F.

In July 2014, Ms. Ramirez entered the United States. Harris Decl., Ex. A at 1. In the Rio Grande Valley, she was detained by the Border Patrol, which instituted expedited removal proceedings under 8 U.S.C. § 1225. *See, e.g.*, Exs. A–B.

Border Patrol Agent Al Aguirre interviewed Ms. Ramirez as part of these proceedings. *Id.*, Ex. A. Ms. Ramirez speaks, reads, and understands only Spanish. Ramirez Decl. ¶ 13; *see* Harris Decl., Ex. C at 1. She recalls some difficulty understanding Agent Aguirre's Spanish. Ramirez Decl. ¶ 35. Ms. Ramirez also recalls being informed that the interview was being recorded. *Id.* ¶ 30. In response to counsel's discovery requests, the government has represented that it has inquired of Customs and Border Protection, and that the government is not in possession of that recording. Harris Decl. ¶ 17.

3

The summer of 2014 was at the peak of an increase in border-crossings called "the surge," when border patrol agents were found to have committed due process errors and cut corners in detention processing and facility conditions.[2]   One of the agents who conducted Ms. Ramirez's expedited removal proceedings, Agent Mahonri Smith, apparently complained about providing due process rights to detainees like Ms. Ramirez, stating publicly that they did not have such rights, and referring (also in public) to border-crossers with a slur.   In April 2013, the owner of a Facebook profile page apparently belonging to Agent Smith publicly posted a link to an article stating that border-crossers "increasingly [were] invoking their right to a hearing,"[3] presumably referring to the credible fear determination before an asylum officer required in certain cases by 8 C.F.R. § 235.3(b)(4).   *See* Declaration of Lars Schou ("Schou Decl."), Ex. 1.   The poster stated that he "[had] to deal with these people claiming 'rights' to hearings, which they do NOT have."   *Id.*; *see also* Harris Decl. ¶¶ 14–15.   Ten days later, the same user publicly posted a link to an article titled "Judge Rules Illegal Alien DUI Killer Incompetent to Stand Trial . . ." and referred to border-

---

[2]   *See, e.g.*, *Flores v. Lynch*, 828 F.3d 898, 904 (9th Cir. 2016) ("In 2014, a surge of undocumented Central Americans arrived at the U.S.–Mexico border.   In response, ICE opened family detention centers in Karnes City and Dilley, Texas, and Artesia, New Mexico.   It closed the Artesia center later that year.   The detention centers operate under ICE's Family Residential Detention Standards, which do not comply with the [*Flores*] Settlement."); Pls.' Notice of Voluntary Dismissal at 2, *M.S.P.C. v. Johnson*, No. 1:14-cv-1437-ABJ (D.D.C. Jan. 30, 2015), ECF No. 41 ("[T]he Deputy Secretary of Homeland Security publicly acknowledged the concerns raised about the expedited removal procedures at the Artesia facility, recognizing that 'quite frankly, the advocacy community has identified instances where we have not provided as we should for the care and needs of those families.'") (citation omitted); *see also* Julia Preston, *Hoping for Asylum, Migrants Strain U.S. Border*, N.Y. Times, Apr. 10, 2014, https://www.nytimes.com/2014/04/11/us/poverty-and-violence-push-new-wave-of-migrants-toward-us.html (noting surge in border crossing beginning in 2011).

[3]   William La Jeunesse, *Budget cuts, DC debate have illegals surging across Mexican border, experts say*, Fox News (Apr. 2, 2013), http://www.foxnews.com/politics/2013/04/02/budget-cuts-dc-debate-have-illegals-surging-across-mexican-border-say-experts.html.

crossers using a slur[4]: "the actions of this TONC (racial slur) and the decision of this judge twists

my stomach and ignites my heart with such intense rage that I cannot find words to describe it."

Schou Decl., Ex. 2 (parenthetical explanation in original).

Federal law imposed various requirements on the July 2014 proceeding.  Specifically, the

governing regulation required the agent to "advise [Ms. Ramirez] of the charges against . . . her on

Form I-860, Notice and Order of Expedited Removal," and that he give Ms. Ramirez "an

opportunity to respond to those charges in the sworn statement."  8 C.F.R. § 235.3(b)(2)(i) (2014).

The regulation also required the agent to serve Ms. Ramirez with Form I-860 and that Ms. Ramirez

sign the reverse of the form to acknowledge receipt.  *Id*.  The agent also was required to "create a

record of the facts of the case and statements made by" Ms. Ramirez using Forms I-867A and B.

*Id*.  Furthermore, he was required to "read (or have read) to" Ms. Ramirez all of the information

contained on those forms.  *Id*.

Agent Aguirre's interview of Ms. Ramirez lasted five to ten minutes.  Ramirez Decl. ¶ 36.

She was not shown any documents during the interview, and she does not recall being read any

documents.  *Id*.  Despite the brevity of the interview, Ms. Ramirez raised several topics with Agent

Aguirre.  She told the agent about her young U.S. citizen daughter, A.S., and her belief that the

United States would offer a safer environment in which to raise A.S.; her pregnancy; her having

been targeted by narcotraffickers in Mexico; her family members in the United States; and her

desire to reunite with those relatives.  *Id.* ¶ 33.  Ms. Ramirez did not provide (or possess) any false

documents; nor did she misrepresent her identity or make any false statements.  *Id*. ¶ 32.  At no

---

[4]  *See* Leon Rappoport, *Punchlines: The Case for Racial, Ethnic, and Gender Humor* 47 (2005),
https://books.google.com/books?id=P3HkmPhf2mYC&pg=PA47 ("Another, rather uglier slur
. . . is the term 'tonk,' applied to illegal border crossers from Mexico . . . [explained as] based
on the sound made by a three-cell flashlight when it strikes the head . . . .").

point before, during, or after the interview did any agent explain the nature of the proceedings or read the charge to Ms. Ramirez. *Id.* ¶¶ 29, 37, 40. Instead, Agent Aguirre told her that she "[was] illegal" and that she did not have permission to be in the United States because she did not have documents. *Id.* ¶ 31.

After the interview, Ms. Ramirez was taken to a room and seated across from Agent Smith. Ramirez Decl. ¶ 39. He showed Ms. Ramirez several documents, including a three-page Form I-867A "Record of Sworn Statement." *Id.* ¶ 40; Harris Decl., Ex. C. The document, which is in English only, purported to memorialize Ms. Ramirez's statements in the expedited removal proceedings. Harris Decl., Ex. C. It contained typewritten questions and answers relating to Ms. Ramirez's identity, national origin, admissibility to the United States, fear of persecution or torture, and consular rights. *Id.*

Those questions and answers did not accurately reflect Ms. Ramirez's earlier interview.[5] They omitted several important topics that Ms. Ramirez had discussed, including her references to her daughter, her pregnancy, her relatives living in the United States, and the violence in Mexico. Ramirez Decl. ¶ 47. The document also purported to reflect discussion of topics that never were raised in the interview, such as Ms. Ramirez's consular rights. *Compare* Ramirez Decl. ¶ 47 *with* Harris Decl., Ex. C.

The I-867A document also contained English-language explanations of, among other things, the purpose of the statement, the nature of the proceedings, and a determination that Ms. Ramirez did not appear to be admissible. Harris Decl., Ex. C. Despite knowing that

---

[5]  A study commissioned by Congress in 2005 of sworn statements taken in expedited removal proceedings found that 72 percent of statements studied were not read or reviewed before signing. 2 U.S. Comm'n on Int'l Religious Freedom, Report on Asylum Seekers in Expedited Removal, at 18–19 (Feb. 8, 2005), http://www.uscirf.gov/sites/default/files/resources/stories/pdf/asylum_seekers/evalCredibleFear.pdf.

Ms. Ramirez did not understand English, Agent Smith did not translate this document into Spanish or explain it.   Ramirez Decl. ¶ 40.   In particular, Agent Smith did not translate or explain to Ms. Ramirez the document's discussion of the nature of the proceedings against her, its allegations and preliminary determinations regarding admissibility, and Ms. Ramirez's right to obtain additional investigation of potential fear of removal.   *Id.* ¶¶ 40, 42.   Instead, Agent Smith directed Ms. Ramirez to initial some pages of the I-867A and to sign others.   *Id.* ¶ 40.   Ms. Ramirez complied, but she did not and could not understand what she was signing.   *Id*.

Agent Smith also showed Ms. Ramirez a separate one-page "Jurat for the Record of Sworn Statement" on Form I-867B and a "Notice to Alien Ordered Removed/Departure Verification" on Form I-296.   Harris Decl., Exs. D–E.   The Jurat contained four typewritten questions and answers relating to the purpose of Ms. Ramirez's travel to United States; fear, concern, or potential harm arising from her return to Mexico; and whether she had any questions or additional statements. Harris Decl., Ex. D.   It also included a one-paragraph affirmation stating that Ms. Ramirez had reviewed the "*1* pages (including this page)" of the statement in the expedited removal proceedings.   *Id.* (emphasis added).   The Notice to Alien Ordered Removed stated, among other things, that Ms. Ramirez had been found inadmissible under the Immigration and Nationality Act ("INA") and that she was prohibited from entering or attempting to enter the United States for a period of five years.   Harris Decl., Ex. E.

Both documents are written only in English, and neither indicates that any translation or explanation was provided to Ms. Ramirez (verbal or otherwise).   *Id.*;   Harris Decl., Ex. D. Ms. Ramirez does not recall Agent Smith (or any other agent) explaining or translating either document, in particular the Verification's statement that she was subject to a five-year bar on returning to the United States.   Ramirez Decl. ¶ 49.   In fact, she recalls being surprised when she

7

was later told about the five-year bar by one of her family members, and wondering why nobody had told her during the proceedings that she would be subject to such a bar. *Id*. Again at Agent Smith's direction, Ms. Ramirez signed both the Jurat and the Notice to Alien Ordered Removed, but she did not understand either document. *Id.* ¶¶ 40, 49.

Ms. Ramirez does not recall being shown Form I-860—the "Notice and Order of Expedited Removal"—or having its contents read, explained, or translated for her. *Id.* ¶ 44. The relevant regulation required that she acknowledge service of Form I-860 by signing the reverse of the document, but the copy of that form in Ms. Ramirez's alien file, Harris Decl., Ex. B, does not include the reverse side and shows no evidence of her signature; nor does she recall signing this document. *Compare* 8 C.F.R. § 235.3(b)(2)(i) (2014) *with* Ramirez Decl. ¶ 44. The government has represented in response to counsel's discovery requests that there is no reverse side of this document in its records. Harris Decl. ¶ 17.

At the conclusion of the expedited removal proceedings, the Border Patrol determined that Ms. Ramirez was inadmissible because she was not in possession of a valid entry document. Harris Decl., Ex. B. The agents did not find any misrepresentation or fraud. *Id.*; Harris Decl., Ex. G. On or about July 17, 2014, she was removed to Mexico. Harris Decl., Ex. G at 1.

Ms. Ramirez later returned to the United States, where her daughter A.S. had been born in 2011. *See* Ramirez Decl. ¶¶ 3–4, 20. After living briefly in Pittsburgh, where she gave birth to her daughter M.S., she and her husband Miguel Ángel Sánchez Ocampo settled in the Buffalo area to raise their daughters and build a life with their relatives living in the United States. *Id.* ¶¶ 3–4, 9–11, 20, 51.

On October 18, 2016, as part of an investigation targeting a restaurant owner, immigration agents carried out raids at four Mexican restaurants in the Buffalo area. Liz Robbins, *Owner Was*

*Target, but Restaurant Workers Are Swept Up in Immigration Raids*, N.Y. Times, Nov. 11, 2016,

https://www.nytimes.com/2016/11/12/nyregion/immigration-workplace-raids-buffalo.html.

Ms. Ramirez's husband, an employee, was arrested at one of the restaurants, Ramirez Decl. ¶ 7,

and the agents also arrested Ms. Ramirez, who was at home with her children.  Ramirez Decl. ¶ 6;

*see* Arrest Warrant, ECF No. 5.

In April 2017, the government obtained an indictment of Ms. Ramirez, charging that she

"having been previously removed from the United States on or about July 17, 2014, was found in

the United States, without having obtained the express consent of [the authorities] to reapply for

admission to the United States[, in violation of 8 U.S.C. § 1326(a)]."  Indictment, ECF No. 19.

Ms. Ramirez's husband, the father of her children, also was charged with illegal reentry: he was

convicted and, in or around June 2017, he was removed.  Ramirez Decl. ¶ 7.

## LEGAL STANDARD

Defendants charged with violating 8 U.S.C. § 1326 may seek dismissal by collaterally

attacking the removal order upon which the charge is based.  *See* 8 U.S.C. § 1326(d) (2012).

Specifically, dismissal is required if three conditions are met: "(1) the alien exhausted any

administrative remedies that may have been available to seek relief against the [prior deportation]

order; (2) the deportation proceedings at which the order was issued improperly deprived the alien

of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair."

*United States v. Gill*, 748 F.3d 491, 497 (2d Cir. 2014) (citing 8 U.S.C. § 1326(d)).

Congress did not intend to allow collateral attack of underlying removal orders in § 1326

prosecutions.  *United States v. Mendoza-Lopez*, 481 U.S. 828, 835–36 (1987).  But presented with

a case where the underlying deportation "violated due process," the Supreme Court held that "a

collateral challenge to the use of a deportation proceeding as an element of a criminal offense must

be permitted" where the proceeding is not subject to judicial review.  *Mendoza-Lopez*, 481 U.S.

9

at 837–40.  In response to *Mendoza-Lopez*, Congress enacted § 1326(d), codifying (and setting conditions for) that collateral challenge.  *See United States v. Scott*, 394 F.3d 111, 116 (2d Cir. 2005).

When it introduced § 1225 expedited removals in 1996, Congress tried to forbid this Court from evaluating § 1326(d) collateral challenges to § 1225(b)(1) expedited removal orders.  *See* 8 U.S.C. § 1225(b)(1)(D) (2012).  But *Mendoza-Lopez* still compels that "*some* meaningful review" of expedited removal orders remain available in § 1326 prosecutions, and the Ninth Circuit has held that "§ 1225(b)(1)(D) is unconstitutional to the extent it prohibits [that review]." *United States v. Barajas-Alvarado*, 655 F.3d 1077, 1087 (9th Cir. 2011) (citing *Mendoza-Lopez*, 481 U.S. at 837–38).  This is because "[d]epriving an alien of the right to have the disposition in a deportation hearing reviewed in a judicial forum requires, at a minimum, that review be made available in any subsequent proceeding in which the result . . . is used to establish an element of a criminal offense."  481 U.S. at 839.[6]

"To show fundamental unfairness [under Section 1326(d)(3)], a defendant must show both a fundamental procedural error and prejudice resulting from that error."  *United States v. Copeland*, 376 F.3d 61, 70 (2d Cir. 2004) (alteration in original, internal quotation marks omitted).  Ms. Ramirez need not establish that the error definitively altered the result of the removal

---

[6]   The broader § 1252(a)(2)(A) limitation on judicial review of § 1225(b)(1) orders, noted below, does not apply to § 1326 collateral challenges.  *See Barajas-Alvarado*, 655 F.3d at 1082 (distinguishing "direct appeal from an expedited removal order," barred by § 1252(a)(2)(A), from a "collateral challenge" to prosecution under § 1326 protected by *Mendoza-Lopez* from § 1225(b)(1)(D)); *cf. Shunaula v. Holder*, 732 F.3d 143, 146–47, 147 n.7 (2d Cir. 2015) (distinguishing challenge to civil inadmissibility determination, barred by § 1252(a)(2)(A), from challenge to use of expedited removal as an element of a criminal offense, but not reaching whether § 1252(a)(2)(A) could bar § 1326 collateral challenges given the holding of *Mendoza-Lopez*).  To the extent that § 1252(a)(2)(A) could be read otherwise, it likewise would be "unconstitutional to the extent it prohibits" such challenges.  *See Barajas-Alvarado*, 655 F.3d at 1087.

proceeding: instead, she need show only a "reasonable probability" that the outcome would have been different but for the error. *Id.* at 73 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). A "reasonable probability" is one "sufficient to undermine confidence in the outcome." *Scott*, 394 F.3d at 118 (quoting *Strickland*, 466 U.S. at 694); *see also United States v. Copeland*, 369 F. Supp. 2d 275, 287–88 (E.D.N.Y. 2005), *on remand from* 376 F.3d 61 (2d Cir. 2004) ("While 'reasonable probability,' the term of art selected by the Court of Appeals, seems deliberately designed to be fuzzy in concept and articulation, it is suggested that a probability of 20% . . . represents a sensible and enforceable standard, considering that deportation often has such serious consequences . . . . [In a case involving a criminal prosecution,] [r]equiring a petitioner to meet a burden greater than 20% to establish a 'reasonable probability' . . . would . . . seem unfair and unreasonable.").

In *Copeland*, the Second Circuit explained that courts should evaluate prejudice "akin to a trial within a trial" by "first obtain[ing] all of the facts relevant to the particular alien" and then applying the relevant standards to those facts, "taking into account actual cases in which similarly situated aliens have been granted or denied discretionary relief," with the record to be "supplemented if necessary by an evidentiary hearing . . . ." 376 F.3d at 73–75.

## ARGUMENT

I.      **By statute, Ms. Ramirez was prohibited from seeking administrative or judicial review, satisfying §§ 1326(d)(1) and (d)(2).**

When immigration officials detained her in July 2014, Ms. Ramirez was placed into proceedings under 8 U.S.C. § 1225, which enables the government to remove on an expedited basis aliens who: (1) "'are physically present in the United States without having been admitted or paroled,' (2) are discovered 'within 100 air miles' of the United States border, and (3) cannot establish that they have been 'physically present in the United States' for the fourteen days prior

11

to the encounter with immigration authorities." *United States v. Raya-Vaca*, 771 F.3d 1195, 1199 (9th Cir. 2014) (citation omitted).   Those aliens are designated for this statute's purpose as "applicants for admission" into the United States.  *Id.* (citing 8 U.S.C. § 1225(a)(1)).

These proceedings evade both administrative and judicial review.  *See* 8 U.S.C. § 1225(b)(1)(C) (2012) ("Except as provided [in the subparagraph regarding credible-fear determinations], a removal order . . . is not subject to administrative appeal . . . ."); *id.* § 1225(b)(1)(A)(i) ("If an immigration officer determines that an alien . . . who is arriving in the United States . . . is inadmissible[,] the officer shall order the alien removed from the United States without further hearing or review . . . ."); 8 U.S.C. § 1252(a)(2)(A) (2012) (limiting judicial review of § 1225(b)(1) removal orders to specific classes of determinations in habeas proceedings); 8 C.F.R. § 235.3(b)(2)(ii) (2014) ("Except as otherwise provided in this section, such alien is not entitled to a hearing before an immigration judge in proceedings conducted pursuant to section 240 of the [INA], or to an appeal of the expedited removal order to the Board of Immigration Appeals."); *see also Copeland*, 376 F.3d at 68 (finding deprivation of judicial review where the interval between entry of the final deportation order and the physical deportation was "too brief to afford a realistic possibility of filing a habeas petition").   Courts considering collateral challenges to § 1225 expedited removal proceedings have found that the first and second requirements of § 1326(d) necessarily are met.  *See Raya-Vaca*, 771 F.3d at 1202; *Barajas-Alvarado*, 655 F.3d at 1081–82.

Ms. Ramirez was detained, processed, and removed under § 1225.  Harris Decl., Ex. B. She could not seek administrative or judicial review.   *See* 8 U.S.C. §§ 1225(b)(1)(A)(i), 1225(b)(1)(C), 1252(a)(2)(A); 8 C.F.R. § 235.3(b)(2)(ii).   Accordingly, the collateral challenge conditions of §§ 1326(d)(1) and (d)(2) are satisfied.

II.     **The July 2014 removal order was fundamentally unfair because there is a reasonable probability that numerous due process violations caused Ms. Ramirez to be removed rather than be permitted to withdraw her application for admission, satisfying § 1326(d)(3).**

A.     **The Constitution guaranteed Ms. Ramirez due process protections including notice, a meaningful opportunity to be heard, and an impartial and disinterested adjudicator.**

Even aliens who are unlawfully present in the United States are entitled to due process under the Constitution. *E.g.*, *Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008) ("In the removal context, that means an alien who has 'passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness.'" (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953))). Notwithstanding their abbreviated nature, expedited removal proceedings under § 1225 must comply with fundamental constitutional due process requirements. *Raya-Vaca*, 771 F.3d at 1202–03. Due process "at the core" includes "the right to notice of the nature of the charges and a meaningful opportunity to be heard." *Pierre v. Holder*, 588 F.3d 767, 776 (2d Cir. 2009) (citation omitted). Due process also requires that the adjudicator of removal proceedings be "impartial and disinterested" and conduct proceedings without "the appearance of bias or hostility." *Ali*, 529 F.3d at 490 (citations and quotations omitted).

B.     **The Constitution and federal law mandated the specific procedure that Ms. Ramirez should have received.**

During § 1225 removal proceedings, immigration officials must determine whether an alien "(1) has made a material misrepresentation to gain admission into the United States, (2) has 'falsely represent[ed]' himself to be a United States citizen, or (3) does not possess a 'valid entry document.'" *Raya-Vaca*, 771 F.3d at 1199 (citing 8 U.S.C. §§ 1225(a)(3), (b)(1)(A)(i)) (alteration in original).

Federal law and regulations—here "mandated by the Constitution" to implement the minimum "notice" and "opportunity to respond" that due process requires—set the requirements for an immigration official to conduct, and create the official record of, a § 1225 proceeding. *Raya-Vaca*, 771 F.3d at 1204 (citations omitted). Among other requirements, the examining officer *must*:

- "create a record of the facts of the case and statements made by the alien";

- "read (or have read) to the alien all information contained on Form I-867A";

- "record the alien's response to the questions contained on Form I-867B, and have the alien read (or have read to him or her) the statement and [have the alien sign] and initial each page of the statement and each correction";

- "advise the alien of the charges against him or her on Form I-860, Notice and Order of Expedited Removal and [give the alien] an opportunity to respond to those charges in the sworn statement";

- "serve the alien with Form I-860 and [have the alien sign] the reverse of the form acknowledging receipt . . ."; and

- "[use] [i]nterpretative assistance [if] necessary to communicate with the alien."

8 C.F.R. § 235.3(b)(2)(i) (2014); *see also* 8 U.S.C. § 1103(a)(3) (2012) (granting Secretary of Homeland Security authority to prescribe regulations "necessary for carrying out his authority under the provisions of this chapter").

### C.       The government agents failed to provide the due process to which Ms. Ramirez was entitled.

The border patrol agents conducting Ms. Ramirez's 2014 expedited removal proceedings repeatedly failed to follow the regulation.  Courts in the Second Circuit have held that similar "fundamental procedural errors"—in particular, the failure to advise of potential discretionary relief from removal—render a prior removal "fundamentally unfair." *See, e.g.*, *United States v.*

*Sosa*, 387 F.3d 131, 138 (2d Cir. 2004); *United States v. Gonzalez*, No. 15-CR-0021, 2015 WL 3443942, at *6–7, *11 (S.D.N.Y. May 29, 2015); *United States v. Clinton*, 653 F. Supp. 2d 446, 452–53 (S.D.N.Y. 2009); *United States v. Garcia*, No. 08-cr-32, 2008 WL 3890167, at *7–8, *11 (E.D.N.Y. Aug. 19, 2008).  In many respects, the facts of this case are even stronger than those underlying *Raya-Vaca*, where the court dismissed an illegal reentry indictment based on errors similar to those committed by the agents.  Their "fundamental procedural errors," *Copeland*, 376 F.3d at 70, deprived Ms. Ramirez of her constitutional due process protections and satisfy the first part of the § 1326(d)(3) fundamental unfairness test.

1.   ***The government agents failed to give notice to Ms. Ramirez of the charge, supporting allegations, or potential discretionary relief.***

Agent Smith completed the front of Form I-860 in English.  Harris Decl., Ex. B.  But he cannot have "advise[d] [Ms. Ramirez] of the charges against [her] on Form I-860," 8 C.F.R. § 235.3(b)(2)(i) (2014), because, even if he *had* served the form on her, she would not have been able to read it, and he did not translate or explain it to her in Spanish.  Harris Decl., Ex. B; Ramirez Decl. ¶¶ 36, 40; *see also United States v. Mosquera*, 816 F. Supp. 168, 175 (E.D.N.Y. 1993) ("For a non-English speaking defendant to stand equal with others before the court requires translation. . . . A criminal defendant cannot aid in his own defense without meaningful access to relevant documents he or she can understand.").

In fact, at no point in the proceeding was Ms. Ramirez advised of the specific allegations or authority under which she was detained.  Ramirez Decl. ¶¶ 37, 40, 42.  The regulation required the border patrol agents to inform Ms. Ramirez of the charges against her, and to use interpretative assistance if necessary to ensure that she understood them.  8 C.F.R. § 235.3(b)(2)(i) (2014).  The agents, however, failed to follow this mandatory procedure—throughout the expedited removal proceeding, Ms. Ramirez remained unaware of the specific accusations against her or that an order

of removal (in addition to other consequences) could arise from those allegations.  *See* Ramirez Decl. ¶¶ 37, 40, 42.

The same regulation required Agent Smith to serve Form I-860 on Ms. Ramirez and to have her sign the "reverse of the form" to acknowledge receipt.  *See generally* Harris Decl., Ex. B. But the government has not produced that reverse side, and has represented that there is no reverse side in its records.  Harris Decl. ¶ 17.  This absence supports Ms. Ramirez's recollection that she did not receive Form I-860 and was not advised of its contents.   Ramirez Decl. ¶ 42; *see United States v. Arteaga-Gonzalez*, No. 12-CR-4704-L, 2013 WL 5462285, at *4 (S.D. Cal. Sept. 30, 2013) (where government "did not have evidence that Defendant had signed the reverse side of the I-860 form as required by agency regulations," "it appear[ed] Defendant was not advised of the charges against him and did not have a chance to refute" the allegations against him and he therefore was "not given the due process to which he was entitled" (citation omitted)); *United States v. Mejia-Avila*, No. 2:14-CR-0177-WFN-1, 2016 WL 1423845, at *1 (E.D. Wash. Apr. 5, 2016) ("As Form I-860 provides notice to Defendant of his rights, a missing signature on that page undermines the assurance that he was notified of his due process rights at the time of his removal.").

Without proper notice, Ms. Ramirez could not and did not understand the nature of the proceedings.  *See* Ramirez Decl. ¶¶ 37, 40, 42.  Although she was aware that the officials detaining her were U.S. immigration officials, she did not understand that her detention and questioning constituted a formal administrative proceeding, much less that it could produce an order affecting her ability to travel to the United States in the future.  *Id.* ¶¶ 37, 40, 42, 44–45, 49.

Furthermore, the agents did not inform Ms. Ramirez of her eligibility to withdraw her application for admission.  Ramirez Decl. ¶ 50.  As in her March 2011 encounter with border

agents, *id*. ¶¶ 16, 19, Ms. Ramirez was eligible in July 2014 for this discretionary form of relief. *See* 8 C.F.R. § 1235.4 (2014); *infra* p. 22.   Deprived of notice of the nature of the proceedings against her, it would have been difficult for Ms. Ramirez to understand that she was subject to a substantially different (and harsher) disposition in 2014.

As *Copeland* shows, the "failure to advise a potential deportee of a right to seek [discretionary] relief" itself "can, if prejudicial, be fundamentally unfair within the meaning of Section 1326(d)(3)."   *See* 376 F.3d at 71 (referring to INA § 212(c) relief); *Gonzalez*, 2015 WL 3443942, at *9 ("join[ing] the Ninth Circuit and every other court that has decided the issue in [the Second] Circuit in holding that the failure to [advise of] the availability of voluntary departure, if prejudicial, can render the entry of [a] deportation order fundamentally unfair . . . ."); *United States v. Miranda-Rivera*, 206 F. Supp. 3d 1066, 1070–71 (D. Md. 2016) (holding that failure to advise alien of ability to apply for asylum and withholding of removal "deprived [the alien] of his right to due process," the Fourth Circuit analog of the Second Circuit "fundamental procedural error" test).

Border patrol agents conducting expedited removals, like immigration judges, "have a duty to develop the administrative record."   *Compare Copeland*, 376 F.3d at 71, *with* 8 C.F.R. § 235.3(b)(2)(i).   "[Because] many aliens are uncounselled" in immigration court, it falls to the adjudicator "to explain the law accurately to pro se aliens.  Otherwise, such aliens would have no way of knowing what information was relevant to their cases and would be practically foreclosed from making a case against removal." *Copeland*, 376 F.3d at 71.

Given the language barrier, the agents' failure to provide notice, and their failure to explain the proceedings and allegations, Ms. Ramirez was left in the dark about the specific basis on which she was detained, the nature of the legal process, the consequences of a finding against her, and

the relief available to her.  Ramirez Decl. ¶¶ 37, 40, 42, 44–45, 49–50.  These failures violated

Ms. Ramirez's right to due process.  *See Pierre*, 588 F.3d at 776.

    **2.**       ***The government agents failed to create an accurate record of Ms. Ramirez's statements, which deprived her of a meaningful opportunity to respond.***

The same regulation further required the agents to "create a record of the facts of the case

and statements made by" Ms. Ramirez.  8 C.F.R. § 235.3(b)(2)(i) (2014).  But the two documents

that purport to be the official record of her statements—Forms I-867A and I-867B—do not

accurately reflect them.  Ramirez Decl. ¶¶ 45, 47.  Neither document reflects her discussion with

Agent Aguirre of her daughter, her relatives living in the United States, her fear of violence in

Mexico, or her pregnancy.  *Id.*  In addition, although the final page of Form I-867A states that

Ms. Ramirez was informed of her consular rights and declined to request to speak with a consular

officer, Harris Decl., Ex. C at 3, she does not recall any such notice.  Ramirez Decl. ¶¶ 45, 47.  The

government agents' failure to record her statements accurately as required by the regulation

deprived Ms. Ramirez of her due process right to a meaningful opportunity to respond.  *See*

*Augustin v. Sava*, 735 F.2d 32, 37–38 (2d Cir. 1984) (observing that "[t]he very essence of due

process is a 'meaningful opportunity to be heard'" and finding denial of procedural rights and

"very likely" of due process where inaccurate government-provided translation of asylum

application "did not state [the] true claim" (citation omitted)).

    **3.**       ***The government agents failed to translate critical documents before instructing Ms. Ramirez to sign them, again violating her due process rights to notice and a meaningful opportunity to respond.***

After interviewing Ms. Ramirez, the agents prepared, among other documents, forms

I-867A and I-867B and a document titled "Notice to Alien Ordered Removed/Departure

Verification."  Harris Decl., Exs. C–E.  Form I-867A purported to be a "Record of Sworn

Statement" in the removal proceedings.  Harris Decl., Ex. C.  Form I-867B purported to be a

"Jurat" for the "Record of Sworn Statement."   Harris Decl. Ex. D.   Agent Smith showed Form I-867A to Ms. Ramirez.  Harris Decl., Ex. C; Ramirez Decl. ¶¶ 40, 45.  The document was written in English.  Ramirez Decl. ¶¶ 40, 45.  Agent Smith knew that Ms. Ramirez did not read English, but he did not translate or read it for her in Spanish.  *Id*.  Instead, he instructed her to initial each page, which she did.  Harris Decl., Ex. C.  He likewise showed Form I-867B (also written in English) to Ms. Ramirez and, without translating or explaining it, directed her to sign it, which she did.   Harris Decl., Ex. D; Ramirez Decl. ¶¶ 40, 45.   Agent Smith also showed Ms. Ramirez the "Notice to Alien Ordered Removed/Departure Verification," again, written in English.  Harris Decl., Ex. E.  He did not translate and read this document, nor did he explain what it was.  Ramirez Decl. ¶¶ 40, 49.  Instead, he simply directed Ms. Ramirez to sign the document and fingerprint it.  *Id*.  Despite not understanding the document, she complied.  *Id.*; Harris Decl., Ex. E.

The record therefore shows that Ms. Ramirez was removed on the basis of documents and charges of which she had no notice, and that the agents' failure to translate and read these documents in Spanish before obtaining Ms. Ramirez's signatures yet again violated her fundamental due process rights to notice and a meaningful opportunity to be heard.  *Compare* 8 C.F.R. § 235.3(b)(2)(i) (requiring agents to "read (or have read) to the alien all information contained on Form I-867A") *with* Ramirez Decl. ¶¶ 40, 42, 45, 48.  Because of this failure, Ms. Ramirez did not understand the English-language Form I-867A, preventing her from ensuring that it completely and accurately represented her responses during the proceeding—which it did not.  *Id*.

Form I-867B—the Jurat—strongly supports a finding that Agent Smith violated 8 C.F.R. § 235.3(b)(2)(i) by failing to read the required information to Ms. Ramirez.  The paragraph above

her signature states, among other things, "I have read (or have had read to me) this statement, consisting of *1* pages (including this page)."   Harris Decl., Ex. D (emphasis added).   But the "Sworn Statement" on Form I-867A is ***three*** pages long—four pages, including the Jurat on Form I-867B.   *Id.*, Ex. C.   In other words, just as in *Raya-Vaca*, the record shows that Ms. Ramirez acknowledged having read to her only the single page of the Jurat, *not* the other pages of her purported sworn statement, leading to the conclusion that the border officials *did not* translate and read those other pages to Ms. Ramirez before obtaining her signature on Form I-867B.   *See Raya-Vaca*, 771 F.3d at 1205 (observing that the Jurat stated that Raya-Vaca "had 'read (or . . . had read to [him]) this statement, consisting of 1 pages (including this page),'" but that "the Record of Sworn Statement and Jurat together totaled four pages," and ruling that this "error" contributed to holding that Raya-Vaca's due process rights had been violated); *United States v. Ruiz*, No. CR 14-00466 MMM, 2015 WL 13573882, at *2–3 (C.D. Cal. July 2, 2015) (noting same error and government concession of due process violation).

Likewise, Agent Smith failed to translate the English-language "Notice to Alien Ordered Removed/Departure Verification."   Harris Decl., Ex. E.   That document contained the government's official determination that Ms. Ramirez had been "found to be inadmissible to the United States" under the INA and that she would be "prohibited from entering, attempting to enter, or being" in the United States "[f]or a period of 5 years from the date of [her] departure" from the United States.   *Id.*   That document also stated that Ms. Ramirez would potentially be subject to prosecution for entering, attempting to enter, or being found within the United States without the Secretary of Homeland Security's express consent.   *Id.*   Because Agent Smith did not translate it for her, Ms. Ramirez could not understand these determinations and warnings.   Ramirez Decl. ¶¶ 37, 40, 49.

4.     ***The government agents failed to provide an impartial and disinterested adjudicator.***

To disqualify an immigration court judge on the grounds of bias, "it must be demonstrated that the immigration judge had a personal, rather than judicial, bias stemming from an 'extrajudicial' source which resulted in an opinion on the merits on some basis other than what the immigration judge learned from his participation in the case." *Matter of Exame*, 18 I&N Dec. 303, 306 (BIA 1982); *see also Ti Wu Gao v. Gonzales*, 200 F. App'x 31, 35 (2d Cir. 2006) (remanding and ordering assignment to different immigration judge because of prior judge's "bias and hostility towards [Chinese petitioners]").   Agent Smith's apparent public statements before encountering Ms. Ramirez evidence broad negative views about people crossing the U.S.–Mexico border.  *See* Schou Decl., Exs. 1–2.  One post specifically stated that "these people"—people who are entitled to due process protections by our Constitution—do "NOT" have the "'rights' to hearings" that, in fact, were prescribed by the federal regulations governing Agent Smith's work.  *Compare* Schou Decl., Ex. 1 *with* 8 C.F.R. § 235.3(b)(4) (2014).  By failing to provide her with an impartial and disinterested tribunal, the government yet again denied Ms. Ramirez due process.  *Ali*, 529 F.3d at 490.

———————————————

Expedited removal proceedings provide "very limited oversight, review or safeguards to ensure that an alien understands his rights and the consequences of removal actions because an immigration officer in the field . . . [essentially plays] the part of the prosecutor, judge, jury and decision maker." *Arteaga-Gonzalez*, 2013 WL 5462285, at *4.  That is why the government must comply scrupulously with the regulations that govern those proceedings—here, 8 C.F.R. § 235.3(b)(2)(i).   *See Dugdale v. U.S. Customs and Border Prot.*, 88 F. Supp. 3d 1, 7–8 (D.D.C. 2015) ("[G]iven how few means aliens have to challenge expedited removal orders, the

Court believes it important that CBP follow the letter of the law in issuing them, even in cases where the grounds for removal appear clear.").

Yet the government "did not provide even that limited process" to Ms. Ramirez. *See Arteaga-Gonzalez*, 2013 WL 5462285, at *4. The government's failure to notify her of the charge and allegations, failure to inform her of discretionary relief, failure to record her statements accurately, failure to translate and read to her key documents before having her sign them, and failure to provide an impartial and disinterested adjudicator violated her due process rights. *See Pierre*, 588 F.3d at 776–77; *Ali*, 529 F.3d at 490–93; *Raya-Vaca*, 771 F.3d at 1203–06. These violations fulfill the "fundamental procedural error" requirement of § 1326(d)(3)'s "fundamental unfairness" prong.

> ### D. The government agents' failures prejudiced Ms. Ramirez because, absent these fundamental procedural errors, there is a reasonable probability that she would have sought and received withdrawal of her application for admission.

The second part of the § 1326(d)(3) fundamental unfairness requirement is met because, in light of these fundamental procedural errors, there is a reasonable probability that Ms. Ramirez was erroneously removed. *See Copeland*, 376 F.3d at 73. Based on the circumstances in July 2014, it is reasonably probable that Ms. Ramirez would have sought, Ramirez Decl. ¶ 50, and received withdrawal of her application for admission.

Any person subject to expedited removal proceedings is "deemed to have applied for admission, even if he sought to enter or entered the United States illegally." *Raya-Vaca*, 771 F.3d at 1200 n.1 (citing 8 U.S.C. § 1225(a)(1)). Regulation grants the Attorney General or his successor discretion to "permit any alien applicant for admission to withdraw his or her application for admission in lieu of removal proceedings under section 240 of the [INA] or expedited removal under [8 U.S.C. § 1225]." 8 C.F.R. § 1235.4 (2014). Thus, "[w]hen an individual is permitted to

'withdraw' his application for admission, he may leave voluntarily and without a removal order, and thus without facing formal immigration consequences." *Raya-Vaca*, 771 F.3d at 1200. This form of relief has long been emphasized and encouraged in the Department of Homeland Security's prosecutorial discretion guidelines. *See* Harris Decl., Ex. K at 8 ("In many cases, the alien's departure from the United States may be achieved more expeditiously and economically by means other than removal, such as voluntary return, withdrawal of an application for admission, or voluntary departure."); *id.*, Ex. H at 4 (affirming that prior guidance remained in effect as of June 17, 2011).

This grant of discretion is delegated to border officials, historically guided by the Immigration and Naturalization Service's Inspector's Field Manual, which provides "helpful insight" to courts considering the likelihood that a § 1326 defendant would have been granted withdrawal. *Raya-Vaca*, 771 F.3d at 1206–07; INS Inspector's Field Manual § 17.2(a) (2007) ("Field Manual"), available at 2007 WL 7710869. Although CBP withdrew the Inspector's Field Manual in April 2013, it has not yet replaced it.[7] Absent replacement guidance, courts continue to look to the Field Manual when considering collateral challenges to expedited removal proceedings. *See United States v. Garcia-Villa*, No. 14CR1481WQH, 2014 WL 4955703, at *1, *5 (S.D. Cal. Sept. 30, 2014) (applying Field Manual to January 2014 expedited removal); *United States v. Rosales-Aguilar*, No. 13cr3254 BTM, 2014 WL 905913, at *1, *5–6 (S.D. Cal. Mar. 7, 2014) (applying Field Manual to June 2013 expedited removal).

---

[7] In June 2017, CBP represented to a federal district court that it has not completed development of the replacement, called the Officer's Reference Tool. Decl. of James R. Hutton at ¶¶ 4–8, *AILA v. U.S. Dep't of Homeland Sec.*, No. 1:16-cv-02470-TSC (D.D.C. June 7, 2017), ECF. No. 16-2. And in this case, the government represented in response to counsel's discovery request for, among other items, "the electronic instruction manual or manuals that in 2013 superseded the discussion in § 17.2(a) of the former INS Inspector's Field Manual," that it "has complied with its discovery obligations." Harris Decl. ¶¶ 16–17.

The Field Manual calls for a "highly individualized determination and instructs officers to 'consider all facts and circumstances related to the case to determine whether permitting withdrawal would be in the best interest of justice.'" *Raya-Vaca*, 771 F.3d at 1207 (citing Field Manual). To that end, it sets out six non-exclusive factors for officials to consider in a particular case: "(1) the seriousness of the immigration violation; (2) previous findings of inadmissibility against the alien; (3) intent on the part of the alien to violate the law; (4) ability to easily overcome the ground of inadmissibility; (5) age or poor health of the alien; and (6) other humanitarian or public interest considerations." *Id*. (citing Field Manual) (internal quotation marks omitted). Despite a generally broad approach to exercising discretion, the Field Manual directs that "withdrawal should 'ordinarily' not be permitted 'in situations where there is obvious, deliberate fraud on the part of the applicant.'" *Id*. (citing Field Manual).

Once again, the *Raya-Vaca* decision is instructive. Having found due process violations, the court assessed whether Raya-Vaca could show prejudice through the Ninth Circuit standard of "'plausible grounds for relief' from the removal order." *Id.* at 1206. In order to determine whether withdrawal was plausible, the court identified and weighed the discretionary factors discussed below. *Id.* at 1208–10. Despite several factors adverse to Raya-Vaca, government allegations of smuggling, and the government's argument that Raya-Vaca's prior encounters with immigration officials meant he likely was aware of his illegal conduct, the court ruled that Raya-Vaca showed that it was plausible that he would have been granted withdrawal had immigration officials not violated his due process rights. *Id.* at 1210.

If Ms. Ramirez had properly been informed of the charges (and consequences of the charges) against her, she would have requested withdrawal and sought to avoid an order of removal, which would have been a major barrier to her future ability to settle in the United States

with her daughters and extensive U.S. family.   Ramirez Decl. ¶¶ 50–51.   Ms. Ramirez had previously been permitted (in March 2011) to withdraw her application for admission and voluntarily return to Mexico without an order of removal.   *Id.* at ¶¶ 16, 19, 50.   And here, an analysis of the Field Manual's guidelines for withdrawal in the context of Ms. Ramirez's July 2014 removal demonstrates at least a reasonable probability that she would have been granted that remedy again.

### 1.   *Seriousness of the Immigration Violation*

This factor weighs heavily in Ms. Ramirez's favor.   The government's July 2014 allegations and finding were that she was present in the United States without valid documents, not that she committed fraud or made a misrepresentation to gain entry.   Harris Decl., Ex. A at 3. Accordingly, the relative lack of seriousness of her immigration violation would have strongly supported a finding that she should be permitted to withdraw her application for admission. *See, e.g.*, *Ruiz*, 2015 WL 13573882, at *6 (noting the absence of "'fraud, let alone obvious or deliberate fraud, when entering the United States,'" deemed a "'crucial consideration,'" and that defendant's single prior illegal entry meant that the seriousness factor weighed in favor of allowing withdrawal).

### 2.   *Previous Findings of Inadmissibility*

In July 2014, there were no prior findings of inadmissibility against Ms. Ramirez. Accordingly, this factor also would have weighed in favor of granting withdrawal.

### 3.   *Intent to Violate the Law*

Immigration officials may well have found that, by crossing the U.S. border, she manifested an intent to violate the law.   This factor, however, is neither dispositive nor weighty.   Many cases granting relief under § 1326(d) involve defendants with both criminal records and records indicating substantial immigration recidivism, against whom this factor must have weighed more

than it can have against Ms. Ramirez.  *See, e.g.*, *Raya-Vaca*, 771 F.3d at 1199, 1209–10 (awarding § 1326(d) relief despite defendant's intent to violate the law having been established by at least seven unlawful entries into the United States over three years, including multiple entries after having been flagged by the government as a potential alien smuggler, and "fairly minimal" criminal history); *United States v. Grande*, 623 F. App'x 858, 861 (9th Cir. 2015) (awarding § 1326(d) relief despite defendant's "several previous illegal reentries" that evidenced his "intent to violate the law").

### 4. *Ability to Easily Overcome the Ground of Inadmissibility*

Although it is not apparent that Ms. Ramirez could have "easily" overcome her lack of permission to be within the United States, this factor does not weigh heavily against finding a reasonable probability, because Ms. Ramirez had a "relatively straightforward path" to legal status: she had never been ruled inadmissible or deportable, had lived in the United States before the 2014 detention, and had a minor child who was a U.S. citizen.  *Raya-Vaca*, 771 F.3d at 1208; *see Mejia-Avila*, 2016 WL 1423845, at *2 (noting that defendant "had lived and worked in the United States . . . had never been ruled inadmissible or deportable, and at the time had a minor [U.S. citizen son]" and concluding that defendant showed prejudice).

### 5. *Age or Poor Health*

Ms. Ramirez was young and, other than being pregnant, was not suffering from any major health conditions during the July 2014 proceedings.  She communicated her pregnancy to the government.  Ramirez Decl. ¶ 33; *see also* Harris Decl., Ex. J ("Subject claims to be pregnant.").  At that time, DHS instructed its personnel that an alien's pregnancy was a "positive factor" in favor of exercising prosecutorial discretion and that women like Ms. Ramirez were among a "class[] of individuals that warrant particular care."  Harris Decl., Ex. I at 5.  Accordingly, Ms. Ramirez's pregnancy substantially bolsters the probability that border patrol officials would

have, consistent with DHS guidance at the time, granted her withdrawal in lieu of removal, whether her pregnancy were considered as part of this factor or as another "humanitarian or public interest consideration," as discussed below.

Even if pregnancy were not considered under this factor, an unfavorable weighting, being nondispositive, would not preclude a finding of reasonable probability. *Grande*, 623 F. App'x at 861 (awarding § 1326(d) relief despite the fact that, at the time of the challenged expedited removal, the defendant "was 41 years old with no indication of poor health").

### 6. *Other Humanitarian or Public Interest Considerations*

This factor weighs in Ms. Ramirez's favor. She had over a dozen family members that were living (and still live) in the United States with legal status at the time of her expedited removal. Ramirez Decl. ¶¶ 9–11. She also had a U.S.-citizen daughter with whom she planned to live in the United States. *Id.* ¶¶ 3–4, 33; *see Grande*, 623 F. App'x at 861 ("[T]he sixth factor of humanitarian and public interest considerations weighs heavily in Grande's favor because his long-term partner and their two United States citizen children live in the United States."); *Raya-Vaca*, 771 F.3d at 1208 ("Raya-Vaca's partner Trisha and their children, in addition to his mother, siblings, and much of his extended family, currently live in the United States. There is a 'compelling humanitarian interest in keeping families united,' so the humanitarian and public interest factors weigh significantly in Raya-Vaca's favor.") (citations omitted); Harris Decl., Ex. H at 4 ("Particular care should be given when dealing with . . . immediate family members of U.S. citizens."). There is a reasonable probability that border patrol officials would have granted withdrawal based on these facts, given that an order of removal would have significantly imperiled Ms. Ramirez's ability to reunite with her extensive family in the United States.

## CONCLUSION

This Court has jurisdiction to hear a collateral challenge to the removal order underpinning this charge.  The government's failure to provide Ms. Ramirez with due process led to the order, which was not subject to administrative or judicial review.  Because the entry of that order was fundamentally unfair and prejudicial, Ms. Ramirez respectfully requests that this Court dismiss the indictment.

Dated:  New York, New York    Respectfully submitted,
   September 15, 2017

         s/Daniel P. Harris
         Daniel P. Harris
         Alejandro A. Herrera
         *Attorneys for Aida Ramirez-Arellano*
         GIBSON, DUNN & CRUTCHER LLP
         200 Park Avenue
         New York, NY 10166-0193
         Tel: (212) 351-4000
         Email: dpharris@gibsondunn.com