**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

UNITED STATES OF AMERICA,

     Plaintiff,

     -against-

AIDA RAMIREZ-ARRELLANO,

     Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

No. 17-cr-80-FPG-HKS

## DECLARATION OF AIDA RAMIREZ-ARELLANO[1]

I, Aida Ramirez-Arellano, the defendant in the above-titled case, hereby declare as follows:

### Introduction

1. I was born in 1992 in Toluca, Mexico.

2. I make this declaration to the best of my knowledge and recollection.

3. I live in Kenmore, New York, with my two daughters, A.S. and M.S. I also live with my brother-in-law, his wife, and their two-year-old daughter.

4. A.S. was born in 2011 and is five years old. M.S. was born in 2014 and is two years old. Both were born in the United States and are United States citizens.

5. My husband and the father of my children, Miguel Ángel Sánchez Ocampo, lives in Mexico.

6. On October 18, 2016, ICE agents arrested my husband and me. ICE agents entered my home and arrested me with my two children. My children were temporarily held by Child Protective Services. After a day in detention, I was reunited with my children.

---

[1] My name is misspelled in the caption. My maternal surname is spelled "Arellano," not "Arrellano."

7. I later learned that my husband was arrested at his workplace as part of a criminal investigation into his employer. My husband was charged with and convicted of illegal reentry. He was deported to Mexico in or around June 2017.

8. I am the sole caretaker for my two children. I do not have a job. I provide full-time care for my daughters at home. We receive support from my parents, who live in Toluca, Mexico, and from churches and non-profit organizations in Buffalo.

9. I have several blood relatives living in the United States with legal status. Eight of my nieces and nephews are United States citizens living in Illinois and Pennsylvania, and one of my uncles has lived in Los Angeles with legal status for many years.

10. I also have extensive family living in the United States with legal status on my husband's side of our family. Four of his nieces and nephews were born in the United States. Three live in California, and another lives in Buffalo.

11. I estimate that, in total, I have more than a dozen relatives living with legal status across the United States.

12. I have never been convicted of a crime, or charged with a crime until this case.

13. I do not speak, read, or understand English. All of the conversations I describe below were conducted in the Spanish language.

**2011 Voluntary Return**

14. In early 2011, my husband and I decided to come to the United States. We traveled to the United States-Mexico border in March 2011.

15. We traveled together with a group of about fifteen people. After we crossed the United States-Mexico border, we were detained by United States border agents. The agents separated me from my husband and the rest of the group.

16. I was not detained for very long.  I told the agents that this was my first time attempting to enter the United States.  I asked them to release me and my husband, Miguel, and allow us to leave together.  They questioned me briefly.  I mentioned that I was pregnant.

17. The agents told me that I could not enter the United States because I did not have documents. They took my fingerprints.

18. I did not present any false documents or provide any false information to the agents; I answered all of their questions truthfully.

19. I was then returned to Mexico that same day, and my husband was deported to Mexico.

20. Soon after, I moved to Pittsburgh with my husband.  My daughter A.S. was born a few months after we settled down.

21. In February 2012, my husband was removed from Pittsburgh to Mexico.  Soon after he left, I returned to Mexico with my infant daughter so that my husband and I could raise her together. I took a commercial flight to Mexico and did not have any contact with United States immigration officials.

22. After I reunited with my husband in Mexico, we settled down in Mexico to live, work, and raise our daughter.  At the time, we did not plan to return to the United States.

23. After approximately two years, we decided that it was in our family's best interests to try to return to the United States.  The security situation was worsening in our community, and despite our best efforts, we were not able to earn enough money to support ourselves in Mexico. We became convinced that we had to leave after drug gang violence spread in our community. It became common to hear gunshots in our neighborhood, and kidnappings also began to happen regularly.  What frightened us the most, however, involved my sister, Yolanda, and her husband, José Luis, who lived very close to us.  In or around June 2014, narcotraffickers

violently robbed José Luis. Their attackers left a note below the door of their home, threatening to kidnap and harm José Luis and their relatives. As one of their relatives, I feared for myself and for my family.

### 2014 Expedited Removal Proceeding

24. In mid-2014, my husband and I returned to the border. We left our young daughter, A.S., in the care of an aunt in Mexico City. My husband and I crossed the border with a group of others in July 2014, and our group was detained by immigration agents shortly after crossing the Rio Grande into the United States.

25. The agents identified themselves to us as immigration agents, told us to stay quiet, and handcuffed us. We were driven about half an hour to a small building.

26. At this building, the agents asked our names, fingerprinted us, and photographed us. My husband was separated from me and the rest of the group. I and others were driven by bus to a larger building with many more detainees in it.

27. Upon arrival, the agents separated the men from the women. I was asked again about my identity and again was fingerprinted and photographed. I then was taken to a crowded group cell with no beds and told to wait.

28. A long time later, agents came into the cell and called my name. They took me with some others to a room with a bench in front of what looked like a mirror. There were partitioned stations at this bench, with a telephone handset at each station. The agents told me and two other people to sit at these stations and pick up the phone.

29. A man began to speak to me through the phone. I think that he was sitting on the other side of the mirror from me and could see me, but am not sure where he was. He identified himself as an immigration agent. He told me that he was going to interview me and that I needed to tell

the truth. I was not informed of why I was being interviewed, the nature of the proceedings I was in, the charges against me, or my rights.

30. I remember the immigration agent saying that our conversation would be recorded. I do not know how the recording was being done.

31. I remember the agent's telling me that I "am illegal." I remember him telling me that I did not have permission to be in the United States because I did not have papers. He told me that the fastest way to be released and return to Mexico was to sign papers that would be given to me, and that I would then be taken back to Mexico.

32. The agent asked me questions about my identity, why I had traveled to the United States, and whether I had employment waiting for me in the United States. I responded truthfully. I did not have or use any false documents or provide any false information.

33. I told the agent about my family, and he seemed to already know about my daughter A.S. I told him that I was traveling to the United States to give her a safer life and find work to provide for her. I also told him that I wanted to reunite with my relatives who lived in the United States. I told him about the narcotraffickers that targeted me and my relatives in Mexico and that I thought it was too dangerous to live there. We also discussed my 2011 return from the border. The agent asked me if I was pregnant, and I told him that I was.

34. I asked the agent about my husband. The agent mockingly told me that my husband had "won a prize." When I asked what my husband had done wrong, the agent seemed to become angry with me and said that I knew what my husband had done.

35. The agent's Spanish was difficult for me to understand at times, and I asked him to repeat himself a few times during the interview.

36. The interview was short—I believe it lasted between five and ten minutes. I was not shown any documents during the interview. I think that someone else was in the room with the agent. The agent paused a few times to make comments in English, which I did not understand, to somebody else, who I assumed was in a room with him.

37. The agent did not mention anything about a sworn statement or about taking notes of my responses. He did not advise me of any rights I had, about the legal process that I was in, or that I could be ordered removed from the United States. He also did not tell me that I would be prohibited from entering the United States for any period of time.

38. After the agent told me that the interview was over, I put down the phone as I was instructed. A different agent took me back to the holding cell.

39. Later that day, I was taken to a different room. There were many agents and detainees in this room. The agents sat at a long table, and I was ordered to sit across from one of them.

40. This agent presented me with several documents. These were written in English, and the agent did not explain them or translate them for me into Spanish. He flipped through several pages and pointed to sections where my name and other identifying information were written. He asked me to confirm that these pieces of information were correct and then instructed me to sign, without explaining to me what I was signing. I complied. Some pages he asked me to sign, and some pages he asked me to initial. I may also have fingerprinted some pages. On some documents, the agent also signed. He did not read the documents to me in English or in Spanish, and I did not understand what I was signing. I did not know that any of the documents listed allegations against me.

41. I was later taken to a bus with a group of other detainees and driven across the border to Mexico. As we exited the bus, Mexican officials were waiting for us. The United States agents on the bus made us sign a register as we exited the bus.

42. During my detention and conversations with the agents, I do not remember being shown or read the specific allegations or charges against me or being told which law or provision I was accused of violating. Nobody explained to me the nature and potential consequences of the removal proceeding that I was in. I do not remember being told that I could be formally ordered removed in this proceeding.

43. I understood that the process was taking longer than it had in 2011, but I did not know why, or that there was any legally significant difference between this proceeding and my encounter with border agents in 2011.

44. With assistance from an interpreter, I recently reviewed the Notice and Order of Expedited Removal on Form I-860 from 2014 in my immigration file. I do not remember this document or recall anyone's explaining or reading the document or advising me of the charges listed on it, and I do not remember ever signing this document.

45. With assistance from an interpreter, I recently reviewed the Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act on forms I-867A and I-867B from 2014 in my immigration file. I do not remember this document or recall anyone's explaining or reading these documents to me, including the pre-printed paragraphs on the first page of form I-867A or my purported statements on forms I-867A and I-867B.

46. I recognize the four pre-printed questions on Form I-867B, from my detention in Buffalo in October 2016, but I do not remember hearing any of them in Texas in July 2014.

47. These documents are not a complete or accurate record of my statements to border agents during my detention. Many of the statements that I made are missing: for example, there is no mention of my daughter, my pregnancy, the violence that my family and I were fleeing, or my desire to reunite with members of my family in the United States, all of which I discussed with the agents. And some of the questions on the documents were never asked of me: for example, I was not asked about contacting Mexican consular officers and could not have responded to that question. Similarly, my Mexican identification card mentioned in the statement had been kept by agents with my other belongings: it was not with me and I did not discuss it when I spoke with the agents.

48. My purported statement on these documents was never read to me in either English or Spanish, and I was not able to read or review it myself because it was written in English.

49. With assistance from an interpreter, I recently reviewed the Notice to Alien Ordered Removed on Form I-296 from 2014 in my immigration file. I do not recall anyone explaining or reading this document to me. Nobody told me that there would be a five-year period during which I would be prohibited from coming to the United States. In fact, when I learned from a relative who had crossed the border with me that she was told about a five-year restriction, I was confused and surprised. I knew of other detainees who had been told that they were banned from the United States for a certain number of years, but no agent ever told me that, and I did not understand why they would have been treated differently from me.

50. Nobody told me that my entrance into the United States was considered an "application for admission," nor did anyone tell me that it was possible to "withdraw" that application and return to Mexico without a formal order of removal. If I had known that my detention and interrogation were part of a formal removal proceeding that could lead to an order of

removal, and if I had understood the documents that I was told to sign, I would have asked to

be allowed to return voluntarily to Mexico without going through these proceedings or

suffering those consequences, as I was permitted to do in 2011.

51. Above all, my goal was to maintain the potential to live safely with my husband, raise our

daughters in a safe community, and build a life with my extended family in the United States.

I would have requested voluntary return to minimize any obstacles to returning to the United

States in the future.

52. I reviewed a Spanish translation of this declaration prior to signing it.  I understand and

affirm its contents.

53. I declare under penalty of perjury that the foregoing is true and correct.


Executed on:   September 13, 2017
               Buffalo, New York                         Aida Ramirez-Arellano